UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
THE STATE OF MICHIGAN, THE
STATE OF ILLINOIS, THE STATE
OF TEXAS, and ex rel., Brian Walker,

      Plaintiffs,

v.

BEAUMONT HEALTH SYSTEM,
f/k/a William Beaumont Hospital,
COMMUNITY EMERGENCY
MEDICAL SERVICE, a Michigan non-
profit corporation, PARASTAR, INC., a
Michigan for profit corporation,
BEAUMONT MEDICAL
TRANSPORTATION SERVICES, a
Michigan non-profit corporation,
McLAREN REGIONAL MEDICAL
CENTER, a Michigan non-profit
corporation, REGIONAL
EMERGENCY MEDICAL SERVICE,
INC., Michigan non-profit corporation,
LEGACY DMC, d/b/a Detroit Medical
Center, a Michigan non-profit
corporation, DMCare EXPRESS, INC.,
a Michigan non-profit corporation,
OAKWOOD HEALTHCARE INC., a
Michigan non-profit corporation,
HEALTHLINK MEDICAL
TRANSPORTATION SERVICE, INC.,
a Michigan non-profit corporation,
ZIEGER HEALTH CARE
CORPORATION, a Michigan nonprofit

Civil Action No: 13-cv-10068

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. §3730(b)(2)**

**DO NOT PLACE IN PRESS BOX**

**DO NOT ENTER ON PACER**

**TRIAL BY JURY DEMAND**

corporation d/b/a  BOTSFORD
HEALTH CARE, THE BOTSFORD
FOUNDATION and BOTSFORD
HEALTH CARE CONTINUUM,
GENESIS HEALTHCARE SYSTEM,
an Ohio non-profit corporation,
COMMUNITY AMBULANCE
SERVICE, an Ohio non-profit
corporation, CATHOLIC HEALTH
PARTNERS, an Ohio non-profit
corporation f/k/a Mercy Health
System/Mercy Health System Province
of Cincinnati, MERCY HEALTH
MEDICAL TRANSPORTATION, an
Ohio Limited Liability Company, OHIO
STATE UNIVERSITY MEDICAL
CENTER SERVICE BOARD, an Ohio
non-profit corporation, OHIO
MEDICAL TRANSPORTATION,
INC., an Ohio corporation, d/b/a
MedFlight, AKRON GENERAL
MEDICAL CENTER, an Ohio non-
profit corporation,  OHIO HEALTH
CARE ASSOCIATION, an Ohio non-
profit corporation, MEDCARE
AMBULANCE, a fictitious name for
CEMS of Ohio, Inc., an Ohio non-profit
corporation, EDWARD HOSPITAL &
HEALTH SERVICES, an Illinois non-
profit corporation, EDWARD
AMBULANCE SERVICES, LLC, an
Illinois Limited Liability Company,
SCOTT AND WHITE HEALTHCARE,
a Texas non-profit corporation, and
SCOTT AND WHITE EMS, INC., a
Texas corporation,

      Defendants,
      jointly and severally.

VEZINA LAW, PLC
By:   J. Marc Vezina (P76232)
        Monica P. Navarro (P52985)
        Michelle D. Bayer (P55546)
Attorneys for Relator
280 N. Old Woodward Avenue, Suite LL20
Birmingham, MI  48009
Tel:   248.558.2700
Fax:   248.232.1581
*jmv@vezinalaw.com*
*mnavarro@vezinalaw.com*
*mbayer@vezinalaw.com*

## FIRST AMENDED FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

### FILING UNDER SEAL

Qui tam relator Brian Walker ("Relator"), by and through his counsel, VEZINA LAW, PLC., pursuant to Fed. R. Civ. P. 15(a), for his First Amended Complaint states as follows

1.     This is an action under the federal False Claims Act, the Michigan Medicaid False Claims Act, the Illinois False Claims Act, and the Texas Whistleblower statutes.  This complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on defendants until the Court so orders.  The government may elect to intervene and proceed with the action within sixty (60) days after it receives the Complaint.

## INTRODUCTION

2.      This case involves the intentional creation of sham joint ventures between Defendant Community Emergency Medical Service ("CEMS"), a Michigan private ambulance service company; Defendant Parastar, a management services company; and various Defendant Hospitals named herein, for the unlawful purpose of CEMS locking patient referrals from Defendant Hospitals and paying remuneration to Defendant Hospitals remuneration for such referrals.

## PARTIES

3.      Relator is the General Manager of Universal Macomb Ambulance Service, Inc. ("Universal"), a Michigan corporation, who previously did significant business with Defendant Hospital Beaumont Health System, f/k/a William Beaumont Hospital ("Beaumont") and other Michigan hospitals involved in the herein-described scheme.   Relator has thirty-plus years' experience in the ambulance industry.

4.      Relator resides in the County of Macomb, City of Michigan.

5.      Defendant Community Emergency Medical Service ("CEMS") is a Michigan non-profit corporation, based out of Southfield, Michigan, which claims to be the largest not for profit ambulance service provider in Metropolitan Detroit.

6.      Defendant Parastar is a Michigan for-profit corporation and a division of CEMS which is headquartered in Southfield, Michigan.

7.     Defendant Parastar provides management, consulting, and billing services to private and public health care systems in six states, including the joint ventures at issue in this case.

8.     Defendant Beaumont is a full service hospital system based in Royal Oak, Michigan, with satellite operations in Troy, Michigan and Grosse Pointe, Michigan, among other areas throughout Metropolitan Detroit. It claims to be the third largest Medicare provider in the United States.

9.     Defendant Beaumont Medical Transport Services ("Beaumont Transport") is a Michigan non-profit corporation, headquartered in Troy, Michigan.

10.     Beaumont Transport is a joint venture formed in March 2008 between Beaumont and CEMS.

11.     Defendant McLaren Regional Medical Center is a Michigan non-profit corporation which, under the name McLaren Health, has hospital systems throughout the State of Michigan and, particularly, with regard to this the scheme alleged in this case, in Flint, Michigan.

12.     Defendant Regional Emergency Medical Service, Inc. is a Michigan non-profit corporation.

13.     Regional Emergency Medical Service, Inc. is a joint-venture partnership started in January 1996 between the Flint based McLaren Health System and CEMS.

14.     Defendant Legacy DMC d/b/a/ Detroit Medical Center, is a Michigan non-profit corporation headquartered in Detroit Michigan.  It has eight specialty hospitals, rehab facilities, outpatient offices and imaging centers in Detroit, Metropolitan Detroit, and further surrounding areas.

15.     Defendant DMCare Express, Inc. is a Michigan non-profit corporation which provides external ambulance, van and taxi service for all DMC facilities, located in Detroit Michigan.

16.     Defendant DMCare Express is a joint venture between the DMC and CEMS formed in 2007.

17.     Defendant Oakwood Healthcare, Inc., is a Michigan non-profit corporation with its main hospital in Dearborn, Michigan and other locations throughout southeastern Michigan.

18.     Defendant Healthlink Medical Transportation Service, Inc. is a Michigan non-profit corporation located in Taylor, Michigan which services southeastern Michigan, and Oakwood hospital systems.

19.     Defendant Healthlink Medical Transportation Service, Inc. is a joint venture formed in July 1997 with Oakwood Healthcare Inc.

20.     Defendant Zieger Health Care corporation, is a Michigan non-profit corporation d/b/a Botsford Health Care, the Botsford Foundation and Botsford Health Care Continuum with its principal place of business in Farmington Hills,

Michigan.

21.     Defendant ZIEGER d/b/a Botsford operates a 330 bed osteopathic community teaching hospital in Farmington Hills.

22.     From at least 2006 to present, Botsford has been operating its "Botsford Mobile Intensive Care Unit (MICU) in cooperation with CEMS.

23.     Defendant CEMS claims to transport patients to Botsford who "have a medical condition that requires constant monitoring" or "have a **medical condition that makes any other type of transportation difficult.**"

24.     Defendants Zieger/Botsford and CEMS share purchasing and distribution, many medical equipment vendors, financial systems, staff, and reporting systems, accounts payable systems and staff, compliance policies, procedures and staff, security personnel, telecommunications personnel. i.e., Defendant BOTSFORD'S telephone switchboard personnel work in the Defendant CEMS communications center, Defendant CEMS' employees' payroll is processed at Defendant Botsford by Botsford personnel; and Defendant Botsford employees oversee Defendant CEMS' compliance program and the Defendant Parastar's ambulance billing office.

25.     Defendant Genesis Healthcare System is an Ohio non-profit corporation.

26.     Defendant Genesis Healthcare System has two main hospitals in

Zanesville, Ohio and satellite health care offices, facilities and centers throughout the area.

27.     Defendant Community Ambulance Service (recently renamed Genesis Community Ambulance) is an Ohio non-profit corporation located in Zanesville, Ohio.

28.     Defendant Genesis Community Ambulance Service is a joint venture started in 1994 between Defendant Genesis HealthCare System and Defendant CEMS.

29.     Defendant Catholic Health Partners, f/k/a Mercy Health System, is an Ohio non-profit corporation with its main location in Cincinnati, Ohio.

30.     Defendant Catholic Health Partners serves seven regional markets that provide a wide range of healthcare services, including acute care hospitals, long-term care residences, housing sites for the elderly, home health agencies, hospice programs, outreach services and wellness centers, including the Cincinnati region.

31.     Defendant Mercy Health Medical Transportation is an Ohio Limited Liability Company located in Cincinnati, Ohio.

32.     Defendant Mercy Health Medical Transportation was formed in 2012 and is a joint venture between Defendant Mercy Health System and Defendant CEMS which provides ambulance services to the Cincinnati area.

33.     Defendant Ohio State University Wexner Medical Center Service

Board, is an Ohio non-profit corporation located in Columbus Ohio.

34.     Defendant Ohio Medical Transportation, Inc. is an Ohio corporation d/b/a MedFlight based in Columbus, Ohio.

35.     Defendant Akron General Medical Center is an Ohio non-profit corporation hospital system, located in Akron, Ohio.

36.     Defendant Ohio Health Care Association is n Ohio non-profit corporation, located in Lewis Center, Ohio, which is made up of nearly 750 nursing facilities, ICFs/MR, and residential care facilities in the state of Ohio.

37.     Defendant Medcare Ambulance is a fictitious alter ego name for Defendant CEMS of Ohio, Inc., an Ohio non-profit corporation.

38.     Defendant Medcare Ambulance is a partnership between CEMS and MedFlight, an Ohio company who provides air and ground transportation.

39.     Defendant Medflight and Defendant Medcare are a joint venture providing transportation services under the scheme outlined herein for Defendant Ohio Health, Defendant Ohio State University Wexner Medical Center, Defendant Akron General Medical Center and Nationwide Children's Hospital.

40.     Defendant Edward Hospital & Health Services is an Illinois non-profit corporation located in Naperville, Illinois.

41.     Defendant Edward Ambulance Services, LLC is an Illinois Limited Liability Company located in Naperville, Illinois.

42.     Defendant Edward Hospital and Health Services and Defendant CEMS created the joint venture Defendant Edward Ambulance Services in September 2011.

43.     Defendant Scott and White Healthcare is a Texas non-profit corporation based in Temple Texas and serving the central Texas area.

44.     Defendant Scott and White EMS, Inc. is a Texas corporation located in Temple, Texas.

45.     Defendant Scott and White EMS, Inc. is a joint venture started in February 2008 between Scott and White Healthcare and CEMS.

## JURISDICTION AND VENUE

46.     This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §3730(b), which allows a private person to bring suit for a violation of the False Claims Act, pursuant to 28 U.S.C. §1345, and which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America, pursuant to 28 U.S.C. §1331, because this action arises under the laws of the United States.

47.     Pursuant to 31 USC §3732(a), an action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal

Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States.

48.     Pursuant to 31 USC § 3732(b), the district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730.

49.     The Michigan Medicaid False Claims Act claims arise from the same transaction or occurrence, are also supplemental to the federal claims under 28 USC §1367(a), and are filed herein pursuant to M.C.L. §§400.601*et seq.*

50.     The Illinois False Claims Act claims arise from the same transaction or occurrence, are also supplemental to the federal claims under 28 USC §1367(a), and are filed herein pursuant to 740 ILCS 175/1 *et seq.*

51.     The Texas false claims and kickback claims arise from the same transaction or occurrence, are also supplemental to the federal claims under 28 USC §1367(a), and are filed herein pursuant to the Texas Medical Assistance Program, Texas Human Resources Code, § 32.039 *et seq.*, Texas Medicaid Fraud Prevention, Texas Human Resources Code §§ 36.001 *et seq.*, Award for Reporting Medicaid Fraud, Abuse, or Overcharges, Texas Government Code §§ 531.101 *et seq.*

## GENERAL ALLEGATIONS

52.     Defendant CEMS enters into sham ambulance transportation joint ventures with Defendant Hospital systems and other health care entities named herein for the purpose of securing referrals from said Defendant Hospitals in exchange for remuneration to the Defendant Hospitals disguised as joint venture profits.

53.     Through these joint venture schemes, the Defendant Hospitals (or related entities) are required to exclusively refer ambulance transports to the joint venture dedicated to each Defendant Hospital.   All services rendered to these referrals are reimbursed by Medicare and Medicaid.

54.     Defendant Hospitals receive significant remuneration for their referrals to the joint ventures.

55.     Defendant Hospitals' contributions to the joint ventures are minimal, particularly when compared to the remuneration they receive for their referrals; said minimal contributions consist solely of use of their logo/image, a minor upfront cash payment to the joint venture, and a seat in the board of the joint venture.

56.     In truth, other than supplying patients, Defendant Hospitals provide no other significant assets or services to the joint venture and have no day to day responsibilities in the management of the joint venture.

57.     Defendant Parastar provides the management services for the joint venture entities.

58.     CEMS and Parastar provide the employees, vehicles, and operational/administrative/support services for the joint ventures.   Defendant Hospitals only provide the patients.

59.     The joint venture is nothing more than a conduit by which CEMS pays the Defendant Hospitals a financial incentive to refer all of its patients to CEMS.

60.     In fact, at least one purpose, if not the only purpose, for the remuneration paid to Defendant Hospitals through the joint ventures is to secure referrals of patients.

61.     By way of illustration, in late 2007/early 2008 at a meeting in a sandwich shop in Ohio, the head of CMS Greg Beauchmin stated the purpose of the joint venture scheme as follows (paraphrased):

> "The way to get the transports from those hospitals and shut out the other ambulance companies is to create a joint venture with the hospital."

> "Let's get a joint venture with the largest health system, then we lock in all those ambulance transports."

62.     Consistent with the foregoing, when Beauchemin visited potential hospital "partners" to promote the joint venture model, his pitch to them was never about continuity of services or care to patients.   Instead, the pitch was exclusively was always about turning the Hospital's ambulance expense into a source of revenue through Hospital participation in the joint venture.

63.     With a guaranteed referral stream that resulted from the joint ventures,

ambulance transport services uniformly deteriorated under the joint venture regime, further demonstrating that the joint ventures were a means for directing payments to the Hospitals for the referrals, rather than to improve continuity of patient care.

64.     In fact, when an employee complained to Beauchemin about complaints from nurses and patients waiting excessive amounts of time for ambulance transportation through Beaumont Transport, Beauchemin's response (paraphrased) was as follows:  "As long as we keep Beaumont's CFO happy, who cares about the grumpy nurses [who were complaining about long response times]."

65.     Consistently, Defendant Hospitals were granted a large ownership interest in the joint ventures even though their primary, if only, contribution to the joint venture and its day to day operation were patient referrals.

66.     CEMS payments to the Defendant Hospitals through the joint venture schemes violate the federal anti-kickback statute, the federal FCA, and the state FCA acts alleged herein.

## Michigan Sham Joint Ventures

### Beaumont Transport

67.     On or about March-April of 2008, CEMS and Beaumont entered into a joint venture called Beaumont Transport, which is owned 40% by CEMS and 60% by Beaumont.

68.     As part of the joint venture creating Beaumont Transport, Beaumont

entered into a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for Beaumont Transport.

69.    Beaumont's primary contribution to this so-called joint venture is to provide all of the hospital patients needing ambulance transportation.

70.    Beaumont provided the joint venture with exclusivity over its patients.

71.    At least one purpose, if not the only purpose, for the remuneration paid to Beaumont through the joint venture was to secure referrals of patients needing ambulance transportation.

### Regional Emergency Medical Service, Inc.

72.    McLaren Regional Medical Center owns 60% of and supplies the patients for Regional Emergency Medical Service, Inc. without providing any other significant assets or services to the joint venture.

73.    As part of the joint venture creating Regional Emergency Medical Service, Inc., McLaren entered into a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for Regional Emergency Medical Service Transport.

74.    McLaren's primary contribution to this so-called joint venture is to provide all of the hospital patients needing ambulance transportation.

- 13 -

75. McLaren provided the joint venture with exclusivity over its patients.

76. At least one purpose, if not the only purpose, for the remuneration paid to McLaren through the joint venture was to secure referrals of patients needing ambulance transportation.

## DMCare Express, Inc.

77. Legacy DMC ("DMC") owns 50% of and supplies the patients for DMCare Express, Inc. without providing any other significant assets or services to the joint venture.

78. As part of the joint venture creating DMCare Express, Inc., DMC entered into a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for DMCare Express, Inc.

79. DMC's primary contribution to this so-called joint venture is to provide all of the hospital patients needing ambulance transportation.

80. DMC provided the joint venture with exclusivity and preference to transport its patients.

81. At least one purpose, if not the only purpose, for the remuneration paid to DMC through the joint venture was to secure referrals of patients needing ambulance transportation.

## Healthlink Medical Transportation Service, Inc.

82.     Oakwood  Healthcare,  Inc.  ("Oakwood")  owns  50%  of  Healthlink Medical Transportation Service, Inc. ("Healthlink").

83.     As part of the joint venture creating Healthlink, Oakwood entered into a  management  service  agreement  with  CEMS's  "management  arm,"  a  company known as Parastar, which provides all of the management, billing, and consulting services for Healthlink

84.     Oakwood's  primary  contribution  to  this  so-called  joint  venture  is  to provide all of the hospital patients needing ambulance transportation.

85.     Oakwood  provided  the  joint  venture  with  exclusivity  and  preference to transport its patients.

86.     At least one purpose, if not the only purpose, for the remuneration paid to  Oakwood  through  the  joint  venture  was  to  secure  referrals  of  patients  needing ambulance transportation.

## Ohio Sham Joint Ventures

## Community Emergency Medical System

87.     Genesis  Healthcare  System  ("Genesis")  owns  75%  of  Community Emergency Medical System ("CEMS-Ohio") without providing any other significant assets or services to the joint venture.

88.     As part of the joint venture creating CEMS-Ohio, Genesis entered into

a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for CEMS'-Ohio.

89.    Genesis primary contribution to this so-called joint venture is to provide all of the hospital patients needing ambulance transportation.

90.    Genesis provided the joint venture with exclusivity and preference to transport its patients.

91.    At least one purpose, if not the only purpose, for the remuneration paid to Genesis through the joint venture was to secure referrals of patients needing ambulance transportation.

## Mercy Health Medical Transportation

92.    Catholic Health Partners ("Catholic") owns 50% of Mercy Health Medical Transportation Service, Inc. ("Mercy Transport") without providing any other significant assets or services to the joint venture.

93.    As part of the joint venture creating Mercy Transport, Catholic entered into a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for Mercy Transport.

94.    Catholic's primary contribution to this so-called joint venture is to provide all of the hospital patients needing ambulance transportation.

95.     Catholic provided the joint venture with exclusivity and preference to transport its patients.

96.     At least one purpose, if not the only purpose, for the remuneration paid to Catholic through the joint venture was to secure referrals of patients needing ambulance transportation.

## Medcare

97.     Ohio State University Medical Center Service Board, Akron General Medical Center and Ohio Health Care Association, Nationwide Children's Hospital ("Ohio Group") own 60% of Medcare without providing any other significant assets or services to the joint venture.

98.     As part of the joint venture creating Medcare, the Ohio Group entered into a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for Medcare.

99.     The Ohio Group's primary contribution to this so-called joint venture is to provide all of the hospital patients needing ambulance transportation.

100.    The Ohio Group provided the joint venture with exclusivity and preference to transport its patients.

101.    At least one purpose, if not the only purpose, for the remuneration paid to the Ohio Group through the joint venture was to secure referrals of patients

needing ambulance transportation.

## Texas Sham Joint Ventures

### Scott & White EMS

102.   Scott & White Hospital ("Scott & White") own 80% of Scott & White EMS ("EMS") without providing any other significant assets or services to the joint venture.

103.   As part of the joint venture creating EMS, Scott & White entered into a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for EMS.

104.   Scott & White's primary contribution to this so-called joint venture is to provide all of the hospital patients needing ambulance transportation.

105.   Scott & White provided the joint venture with exclusivity and preference to transport its patients.

106.   At least one purpose, if not the only purpose, for the remuneration paid to Scott & White through the joint venture was to secure referrals of patients needing ambulance transportation.

## Illinois Sham Joint Ventures

### Edward Ambulance Services

107.   Edward Hospital & Health Services ("Edward") owns 60% of Edward

Ambulance Services ("EAS") without providing any other significant assets or services to the joint venture.

108.   As part of the joint venture creating EAS, Edward entered into a management service agreement with CEMS's "management arm," a company known as Parastar, which provides all of the management, billing, and consulting services for EAS.

109.   Edward's primary contribution to this so-called joint venture is to provide all of the hospital patients and free-standing Emergency Department's patients needing ambulance transportation.

110.   Edward provided the joint venture with exclusivity and preference to transport its patients.

111.   At least one purpose, if not the only purpose, for the remuneration paid to Edward through the joint venture was to secure referrals of patients needing ambulance transportation.

## These Sham Joint Ventures
## Generate Substantial Revenue From Government Payors

112.   CEMS, Parastar and the joint ventures ambulance transportation companies generate substantial revenue.

113.   For the first three months, ending March 31, 2011, CEMS billed $881, 562 (over $3.5 million annualized)

114.   CEMS payor data for 2011 reports that 18% of its revenue came from

Medicaid and 57% from Medicare.

115.   In 2010, 17% of CEMS revenue came from Medicaid and 56% from Medicare.

116.   In 2009, 18% of CEMS revenue came from Medicaid and 54% from Medicare.

117.   For the same three month time frame ending March 31, 2011, Parastar had $114,829 in revenue (almost half million annualized).

118.   For the same three month time frame ending March 31, 2011, Regional Emergency Medical Services, Inc. had $43,985 in revenue from the unlawful referrals (over $175,000 annualized).

119.   For the same three month time frame ending March 31, 2011, Healthlink Transportation Services had $636,484 in revenue from the unlawful referrals (over $2,5 million annualized).

120.   For the same three month time frame ending March 31, 2011, DMCare had $38,248 in revenue (over $150,000 annualized).

121.   For the same three month time frame ending March 31, 2011, Beaumont Transportation had $118, 141 in revenue (almost $600,000 annualized).

122.   For the same three month time frame ending March 31, 2011, MedCare had $145,358 in revenue (almost half-million dollars annualized).

123.   For the same three month time frame ending March 31, 2011,

Community Ambulance Service had $299,810 in revenue (almost $1 million annualized).

124.   For the same three month time frame ending March 31, 2011, Scott and White Emergency Medical Service had $221,584 in revenue (over $880,000 annualized).

125.   In sum, in 2011 alone, these joint ventures generated referrals secured through kickbacks in the vicinity of $5,8 million. 57% of that (over $3,3 million) was paid by Medicare.  18% of that (over $1 million) was paid by Medicaid.

126.   The magnitude of the joint venture scheme over a five year span is, thus, significant.  Based on the foregoing number and upon information and belief, Medicare and Medicaid have paid well in excess of $20 million for unreimbursable ambulance referrals to CEMS that were secured through kickbacks.

## REGULATORY FRAMEWORK

127.   In 1972, Congress enacted the federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b *et seq*., which prohibits payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government.

128.   The federal health care Anti-Kickback Statute provides that those who knowingly and willfully solicit or receive, offer or pay receive anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or

services for which a federal health care program may make payment shall be guilty of a felony.  42 U.S.C. § 1320a-7b(b)(1).

129.   The Anti-Kickback Statute makes it a criminal offense for someone to knowingly and willfully solicit, pay, or receive any remuneration to induce or benefit referrals which are payable by a Federal health care program.  *See* 42 U.S.C. 1320a-7(b).

130.   The OIG has red-flagged joint ventures, such as the ones at issue in this case, as being suspect and potentially violating the Anti-Kickback Statute. *See* Special Advisory Bulletin, "Contractual Joint Ventures," 68 CFR 23148 (April 30, 2003).

131.   The sham joint ventures created by the Defendants fall squarely within the proscribed conduct in the Special Advisory Bulletin.

132.   Through each joint venture, the Hospital "partner" expanded into a related line of business - ambulance services - which is dependent on referrals from, or business generated by the Hospital partner's existing business.

133.   Each Hospital "partner" contracted out substantially all of the operations of the new business to CEMS, an ambulance supplier already in that business.

134.   CEMS (through Parastar) agreed to provide not only the management services, but all other necessary services to run the business, such as health care personnel, billing, support, etc.

135.   The actual business risk for each Hospital "partner" was and is minimal (if any) because each Hospital "partner" has a captive patient base and the sole ability to influence referrals to the new business.

136.   CEMS was assured exclusivity through the arrangement with the Hospital "partners" who in turn directed their employees to only refer patients to the joint venture.

137.   Absent the joint venture, CEMS would have been a competitor of each Hospital "partner's" new line of business.

138.   The Hospital partners and CEMS share in the economic benefit of the new respective joint ventures, where the Hospital "partners" receive their share from the residual profit of the new business (or increase value in the Joint Venture company).  The payments to the Hospital "partners" vary with the value or volume of business referred to CEMS.  The higher the referral volume, the bigger the revenue.

139.    No safe harbor applies to this arrangement.

140.   The joint venture does not fall within either the Investor Test or Revenue Test safe harbors. 42 CFR 1001.952(a)(2)(i) and (vi).

141.   All of the Hospital "partners" own more than 40% of their respective joint venture.

142.   All Hospital "partners" are in a position to make or influence referrals to CEMS.

- 23 -

143.   All joint ventures receive more than 40% of their gross revenue from referrals generated by the Hospital "partners."

144.   Penalties for violation of the Anti-Kickback Statute include imprisonment up to five years, fines up to $25,000, or both, and mandatory exclusion from the Federal health care programs.  42 U.S.C. §1320a-7(b).

145.   The OIG may also impose civil monetary penalties or initiate administrative proceedings to exclude said party from the Federal health care program for violation of the Act.  *Id.*; 42 USC §1320a-7(a).

146.   The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the Anti-Kickback Statute. 42 U.S.C § 1320a-7a(a)(7).

147.   The payment of kickbacks is a basis for False Claims Act liability.  *See* 31 U.S.C. §§ 3729–3733.

148.   Relator brings this *qui tam* action in the name of the United States of America pursuant to the False Claims Act, 31 U.S.C. §3729 *et seq*. ("FCA") to recover damages and civil penalties for false statements and claims that Defendants made or caused to be made to the United States.

149.   Relator also brings this action for violations of the FCA on behalf of himself and the States of Michigan, Illinois and Texas pursuant to their respective False Claims Acts.

150. As required by the Acts, a statement of all material evidence and information related to the allegations have been provided to the United States government and the Governments of the States of Michigan, Illinois, and Texas (collectively, the "Government"). The disclosure statement/s is/are supported by material evidence known to Relator at the time of filing establishing the existence of Defendants' false claims.

151. The federal False Claims Act provides that a person who knowingly violates the Act by making or causing to be made a false claim to the federal government is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the federal government sustains because of those acts. 31 U.S.C. § 3729(a). As more fully explained herein, services secured through the payment of kickbacks are unreimbursable and claims submitted therefore violate the FCA.

152. The Michigan False Claims Act provides that those who knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits or in determining rights to a Medicaid benefit, or who solicits, offers, or receives a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part through Medicaid or other state program is liable for a civil penalty of not less than $5,000.00 or more than $10,000.00 plus triple the amount of damages suffered

by the state as a result of the conduct by the person.

153.   The Illinois False Claims Act provides that those who knowingly make or cause to be made a false statement or false representation of a material fact in submitting a claim for payment to the State of Illinois or in otherwise defrauding the State of Illinois is liable for a civil penalty of not less than $5,500.00 or more than $11,000.00 plus triple the amount of damages suffered by the state as a result of the conduct by the person as well as costs incurred in prosecuting the action.

154.   The Texas false claim and anti-kickback statutes, the Texas Medical Assistance Program, Texas Human Resources Code, § 32.039 *et seq*., Texas Medicaid Fraud Prevention, Texas Human Resources Code §§ 36.001 *et seq*, Award for Reporting Medicaid Fraud, Abuse, or Overcharges, Texas Government Code §§ 531.101 *et seq*., provide that a person who presents or causes to be presented a claim that contains a statement or representation the person knows or should know to be false and/or solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, among other prohibited action liable for a civil penalty of the amount paid, if any, as a result of the violation and interest on that amount determined at the rate provided by law for legal judgments and accruing from the

date on which the payment was made; and payment of an administrative penalty of an amount not to exceed twice the amount paid, if any, as a result of the violation, plus an amount: (A) not less than $ 5,000 or more than $ 15,000 for each violation that results in injury to an elderly person, as defined by Section 48.002(1), a disabled person, as defined by Section 48.002(8)(A), or a person younger than 18 years of age; or (B) not more than $ 10,000 for each violation that does not result in injury to a person described by Paragraph (A).

155.  The Medicare Program is a health insurance program for individuals 65 years and older, certain disabled individuals under age 65, and people of any age who have permanent kidney failure.  The Medicare statute is codified at 42 U.S.C. § 1395 (Title XVIII of Social Security Act, 42 U.S.C. § 483.1 *et seq*.).

156.  The Medicaid Program is a joint federal-state program funded under Title XIX of the Social Security Act.  42 U.S.C. § 1396 *et seq*.  As a prerequisite to enrollment as a provider in the Medicaid Program, providers are required to enter into provider agreements and agree, among other things, to comply with federal and state provider participation requirements as a condition of federal and state funding. 42 U.S.C. § 1396a(w).

157.  As a condition of participation in the Medicare program and as a condition precedent to the receipt of payment or reimbursement from Medicare of costs incurred for treating and providing care to Medicare beneficiaries, Defendants

are required to certify that each was familiar with the laws and regulations regarding the provision of healthcare services and that the services being billed for reimbursement were in compliance with Medicare laws and regulations.   Said certification was also false.

158.   Through their intentional and fraudulent actions as set forth in this Complaint, Defendants knowingly submitted and caused to be submitted false claims to Medicare and Medicaid in violation of the federal and States FCAs at issue herein.

## COUNT I

### False Claims Act - Presentation of False Claims

159.   Relator realleges and incorporates paragraphs 1 - 158 of this Complaint as if fully set forth herein.

160.   In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers and agents knowingly and/or recklessly presented or caused to be presented false or fraudulent claims for payment or approval for payment by government funds in violation of 31 U.S.C. § 3729(a)(1)(A).

161.   The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

- 28 -

## COUNT II

### <u>False Claims Act - False Statements</u>

162.  Relator realleges and incorporates paragraphs 1 - 161 of this Complaint as if fully set forth herein.

163.  In performing the acts described above, Defendants acting in concert and/or through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record of statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(B).

164.  The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT III
### <u>Michigan Medicaid False Claims Act - Presentation of False Claims</u>

165.  Relator realleges and incorporates paragraphs 1 - 164 of this Complaint as if fully set forth herein.

166.  In performing the acts described above, Defendants CEMS, Beaumont, Beaumont Medical Transportation, Parastar, McClaren Regional Medical Center, Regional Emergency Medical Service, DMC, DMCare Express, Oakwood Healthcare, and Healthlink Medical Transportation Service, acting in

concert and/or through their own actions or through the acts of their officers and/or agents, knowingly presented, or caused to be presented, to an officer or employee of the State of Michigan, a false claim under the Michigan Medicaid False Claims Act in violation of MCLA §400.601 *et seq.*

167. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT IV
### Michigan Medicaid False Claims Act-Kickbacks or Bribes, Payments for Referrals

168. Relator realleges and incorporates paragraphs 1 - 167 of this Complaint as if fully set forth herein.

169. In performing the acts described above, Defendants CEMS, Beaumont, Beaumont Medical Transportation, Parastar, McClaren Regional Medical Center, Regional Emergency Medical Service, DMC, DMCare Express, Oakwood Healthcare, and Healthlink Medical Transportation Service acting in concert and/or through their own actions or through the acts of their officers and/or agents violated MCLA §400.604 of the Michigan Medicaid False Claims Act.

170. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT V

## <u>Texas - Presentation of False Claims</u>

171. Relator realleges and incorporates paragraphs 1 - 170 of this Complaint as if fully set forth herein.

172. In performing the acts described above, Defendants CEMS, Scott & White Hospital and Scott & White Emergency Medical Services acting in concert and/or through their own actions or through the acts of their officers and/or agents, knowingly presented, or caused to be presented, a false claim under the Texas false claim and anti-kickback statutes, the Texas Medical Assistance Program, Texas Human Resources Code, § 32.039 *et seq*., Texas Medicaid Fraud Prevention, Texas Human Resources Code §§ 36.001 *et seq*, Award for Reporting Medicaid Fraud, Abuse, or Overcharges, Texas Government Code §§ 531.101 *et seq*.

173. The State of Texas, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT VI

### <u>Texas- Kickbacks or Bribes, Payments for Referrals</u>

174.   Relator realleges and incorporates paragraphs 1 - 173 of this Complaint as if fully set forth herein.

175.   In performing the acts described above, Defendants CEMS, Scott & White Hospital and Scott & White Emergency Medical Services acting in concert and/or through their own actions or through the acts of their officers and/or agents in seeking kickbacks and payments for referrals violated the Texas false claim and anti-kickback statutes, the Texas Medical Assistance Program, Texas Human Resources Code, § 32.039 *et seq.*, Texas Medicaid Fraud Prevention, Texas Human Resources Code §§ 36.001 *et seq*, Award for Reporting Medicaid Fraud, Abuse, or Overcharges, Texas Government Code §§ 531.101 *et seq.*

176.   The State of Texas, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT VII

### <u>Illinois False Claims Act - Presentation of False Claims</u>

177.   Relator realleges and incorporates paragraphs 1 - 176 of this Complaint as if fully set forth herein.

178.   In performing the acts described above, Defendants CEMS, Parastar,

Edward Hospital & Health Services, and Edward Ambulance Services, acting in concert and/or through their own actions or through the acts of their officers and/or agents, knowingly presented, or caused to be presented, a false claim under the Illinois False Claims Act, 740 ILCS 175/3**.**

179.   The State of Illinois, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendants as follows:

a.   That the 99United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 *et seq*. provides;

b.   That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented and/or payment the Defendants wrongfully avoided paying to the United States;

c.   That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator

necessarily incurred in bringing and pressing this case;

d.    That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e.    That civil penalties of treble damages plus $50,000 be imposed for each violation of the Anti-Kickback Statute;

f.    That the State of Michigan be awarded damages in the amount of three times the damages sustained by the State of Michigan because of the false claims alleged in this Complaint, as the Michigan Medicaid False Claims Act provides;

g.    That civil penalties of $5,000 to $10,000 be imposed for each and every false claim that the Defendants caused to be presented to the State of Michigan Medicaid Program;

h.    That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Michigan Medicaid False Claims Act;

i.    That Relator be awarded the maximum amount allowed pursuant to the Michigan Medicaid False Claims Act;

j.    That the State of Illinois be awarded damages in the amount of three times the damages sustained by the State of Illinois because of the false claims alleged in this Complaint, as the Illinois False Claims Act provides;

k.    That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the State of Illinois;

l.    That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Illinois False Claims Act;

m.    That Relator be awarded the maximum amount allowed pursuant to the Illinois False Claims Act;

n.    That the State of Texas be awarded damages in the amount the damages sustained by the State of Texas because of the false claims alleged in this Complaint, as well as double damages as provided under Texas law;

o.    That civil penalties of (A) not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or (B) not less than $5,500 or the minimum amount imposed as provided by 31

U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A);

p.    That Relator be awarded the maximum amount allowed pursuant to Texas law;

q.    That necessary expenses, costs, and reasonable attorney's fees be awarded;

r.    That this Court award such other and further general, equitable, and legal relief as it deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Relator Walker demands a jury trial on all claims alleged herein.

Respectfully submitted,

/s/J. Marc Vezina
VEZINA LAW, PLC
J. Marc Vezina (P76232)
Monica P. Navarro (P52985)
Michelle D. Bayer (P55546)
Attorneys for Relator Walker
280 N. Old Woodward Avenue
Suite LL20
Birmingham, MI 48009
Tel:   248.558.2700
*jmv@vezinalaw.com*

Dated:  April 17, 2014.